# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROYAL INDEMNITY COMPANY and ROYAL INSURANCE COMPANY OF AMERICA, <br>     Plaintiffs, <br><br> v. <br><br> PENDLETON KING, DAPHNE KING, PENDLETON KING, JR., and CONOR McENTEE, <br>     Defendants, <br>     Third-Party Plaintiffs, <br><br> v. <br><br> NATIONAL SURETY CORPORATION and NEW ENGLAND BROKERAGE CORPORATION, <br>     Third-Party Defendants. | CIVIL ACTION NO. 3:03cv2178 (SRU) |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This dispute arises out of a serious accident involving an all terrain vehicle ("ATV")

owned by Pendleton and Daphne King and operated by Pendleton King, Jr.  The accident caused

Conor McEntee to suffer a life-threatening head injury.  McEntee has sued each of the Kings in

state court for damages related to the accident.  State Court Complaint, doc. # 146-14.[1]  The

Kings owned a homeowner's insurance policy through Royal Indemnity Company ("RIC"), an

umbrella policy through Royal Insurance Company of America ("RICA"), and an excess liability

policy through National Surety Corporation ("National").  Upon notice of McEntee's lawsuit, the

Kings requested that, pursuant to their insurance policies, their insurance companies provide a

---

[1] Because of the volume of briefs, exhibits, and statements pursuant to Rule 56(a), and because multiple motions are pending, exhibits are referred to by title, docket number, and if available, page number.

defense to the lawsuit, and indemnify them for coverage with respect to McEntee's claims in state court. The state court case is still pending.

RIC and RICA then filed suit in this court seeking a declaration that they have no duty to defend or indemnify the Kings. The Kings subsequently filed counterclaims against RIC and RICA, and a third-party complaint against National and New England Brokerage Corporation ("NEBC"), the Kings' insurance broker. NEBC then filed crossclaims against RIC and RICA. All parties have moved for summary judgment.

The arguments presented in the five pending summary judgment motions can be distilled into three broad issues: (1) Whether the Kings' homeowner's policy provides coverage with respect to McEntee's claims; (2) Whether the Kings' umbrella policy provides coverage with respect to McEntee's claims; and (3) Whether NEBC was negligent when it failed to procure an umbrella policy that followed form to the homeowner's policy.

Because the accident did not occur on an "insured location" as the Kings' homeowner's policy defines that term, I hold that the Kings' homeowner's policy does not provide coverage with respect to McEntee's claims. In addition, because the Kings' umbrella policy provided coverage for ATVs only if they were listed on the declarations page of the policy and because no ATVs were listed on that page, I hold that coverage does not exist under the policy's express terms. In addition, RICA effected a valid change to the policy limiting coverage to listed ATVs. Alternatively, even if RICA did not effect a valid change, the Kings have failed to present evidence that they would have been covered under the prior policy. Accordingly, I hold that the Kings' umbrella policy also does not provide coverage with respect to McEntee's claims.

Finally, because the Kings' negligence claim against NEBC hinges on their claim that the

homeowner's policy provides coverage with respect to McEntee's claims, and because I hold today that the Kings' homeowner's policy does not provide such coverage, the Kings' negligence claim fails.

## I.     Background

On May 5, 2002, Pendelton King, Jr., then fourteen years old, was towing his neighbor, Conor McEntee, also fourteen, behind an ATV owned by the Kings.  Police Accident Report, doc. #146-5 at Royal 229.  McEntee, not wearing a helmet, was riding a skateboard while holding onto a rope that was attached to the ATV.  *Id*. at Royal 229, 231.  The two were traveling around Deer Park Association, a private homeowners' association in which the Kings reside and of which the Kings are members.  Pendleton King Aff., doc. #146-2; Warranty Deed, doc. #146-3 at KING0121.  While towing McEntee, King Jr. swerved off the road onto the grass and McEntee fell off the skateboard onto the street.  Police Accident Report, doc. #146-5 at Royal 233.  McEntee's head struck the road causing McEntee to suffer a life-threatening head injury.  *Id*. at 231.  The Kings owned a homeowner's policy through RIC, an umbrella policy through RICA, and an excess liability policy through National.  NEBC assisted the Kings in procuring their policies.

On August 5, 2003, by letter from counsel, the McEntees informed the Kings they planned to sue them in state court.  *See* Letter from John Q. Kelly, doc. #146-8 at KING0083.  On August 8, 2003, the Kings notified RIC and RICA of the accident and the lawsuit.  That case is currently pending in state court.  RIC and RICA subsequently filed a complaint in this court seeking a declaration that Royal has no duty to defend or indemnify the Kings under either the homeowner's policy or the umbrella policy.

After RIC and RICA filed suit against the Kings in this court, the Kings asserted counterclaims against RIC and RICA seeking damages under CUTPA, and for breach of contract, and for breach of the covenant of good faith and fair dealing. The Kings also filed a third-party complaint against National and NEBC, seeking declaratory relief, alleging breach of contract against National and NEBC, and alleging negligence and breach of fiduciary duty against NEBC. NEBC then raised cross-claims against RICA for indemnification and contribution, arguing that it is liable only if RICA was negligent in renewing the Kings' umbrella policy. All parties have moved for summary judgment.

  A.  <u>The Kings' Homeowner's Policy With RIC</u>

 The Kings owned a $500,000.00 homeowner's insurance policy, issued by RIC. Kings' Homeowner's Policy, doc. #146-10 at KING0002. The Kings' homeowner's policy generally excludes coverage for injuries "[a]rising out of the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an insured," or arising out of "[v]icarious liability, whether or not statutorily imposed, for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above." *Id*. at KING0031.

  There is an exception to the general exclusion for motor vehicle coverage, however. The policy provides that the general exclusion of vehicle coverage "does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and . . . owned by an insured and on an insured location." *Id*. at KING0031. The policy defines "insured location" as either (a) "the residence premises;" (b) "the part of other premises, other structures and grounds used by you as a residence . . . ;" or (c) "Any premises

used by you in connection with a premises." *Id*. at KING0016. Finally, the policy defines an "insured" as any person "using [a] vehicle on an insured location with [the policyholder's] consent." *Id*. at KING0016.

B.     The Kings' Umbrella Policy With RICA

The Kings also owned a $5,000,000.00 umbrella insurance policy, issued by RICA. The policy that was in effect on May, 5, 2002,[2] the date of the accident, defines a "covered person" as the insureds, their family members, or "[a]ny other person . . . using a . . . 'recreational motor vehicle' . . . which [the insureds] own." Kings' Umbrella Policy, doc. #154-4 at KING0044. The policy defines an "occurrence" as "[a]n accident . . . which results, during the policy period, in 'bodily injury' . . . ." *Id*. at KING0045. The policy provides that RICA will "pay up to [its] limit of liability for damages for which a 'covered person' becomes legally liable due to 'bodily injury' . . . caused by an 'occurrence' to which this policy applies." *Id*. at KING0046. But the Kings' policy contains a general exclusion to coverage for "bodily injury" that arises out of the "use" of a "recreational motor vehicle." *Id*. at KING0048.

There is an exception to the general exclusion, however, that forms the basis of the claims related to the umbrella policy. Although the policy generally does not cover bodily injury arising

_____

[2] Although there is no dispute among the parties that the Kings had an umbrella policy from RICA at the time of the accident, the parties dispute which document actually set forth the terms of the policy. The Kings contend they never received the "Palme document" that RICA submitted with its motion. The "Palme document" and the document the Kings submitted admittedly have several differences. *Compare* Kings' Umbrella Policy, doc. #154-3 *with* Kings' Umbrella Policy, doc. #154-4 at KING0040. None of the differences between the documents, however, are material to determining whether the Kings' umbrella policy covers the accident. Specifically, both documents require the Kings to list recreational motor vehicles on the declarations page for coverage to apply, and neither policy shows the Kings' ATV listed on that page.

from the use of a recreational motor vehicle, the policy does cover "'recreational motor vehicles' described as being covered in the declarations, if covered by 'primary insurance.'" *Id*. at KING0049. The Kings' umbrella policy does not describe the subject ATV on its declarations page. *Id*. at KING0041.

        C.        The Renewal of the Umbrella Policy

Although the Kings' umbrella policy does not cover motor vehicles not listed on the declarations page, the Kings argue that the policy nevertheless covers the subject accident because their policy formerly covered the ATV, and because RICA failed to effect a valid change to the policy to require the Kings to include the ATV on the declarations page.

The Kings have not provided the prior policy under which ATVs, not listed on the declarations page, were covered. Instead, they rely on the testimony of Darold Palme, RICA's Underwriting Support Director. Palme testified that, prior to 2000, the Kings' umbrella policy covered recreational vehicles used on their own personal property. *See* Palme Dep., doc. #154-5, at 239.

In 2000, however, RICA changed the Kings' umbrella policy to limit coverage for recreational vehicles to those listed on their declarations page and to require payment of an additional premium for coverage to apply. Palme Dep., doc. #154-5 at 214. In a letter addressed to its policyholders,[3] RICA described the change: "All recreational motor vehicles, whether

---

      [3] Palme testified that RICA sent out the September 7 mailing, but that RICA did not keep a log of the mailing, and has no record of mailing the letter to the Kings. *See* Palme Dep., doc. #154-5 at 229. Indeed, the parties dispute whether the Kings actually received the letter. But that dispute is immaterial because, as set forth in greater detail later: (1) the effective policy excluded coverage by its express terms, (2) RICA was not required to comply with the notice requirements set forth in Conn. Gen. Stat. § 38a-323, and (3) the Kings have not presented any evidence to show that coverage existed under their prior policy.

subject to motor vehicle registration or not," must be "declared and shown on the declarations page and a small additional premium charged for coverage to apply." September 7, 1999 Letter, doc. #164-3. The letter also indicated that insureds "will only be covered for those items which we know about and list on your declarations page," so all policyholders should update their records to account for "all of the above types of possessions." *Id*. "Going forward, it will be important for you to inform your agent of any changes in the status of these items." *Id*. The letter concluded "[p]lease rest assured that you will continue to receive the same level of coverage you now have for all of these items. The only difference is that we will list your possessions and businesses on the declarations page." *Id*.

In addition, NEBC addressed a notice to the Kings about the change in RICA's umbrella policy. That notice warned the Kings that RICA had "recently revised the umbrella coverage. It changes and clarifies certain policy provisions." NEBC Memo, doc. #164-6. The memo continued, "all recreational motor vehicles – whether subject to motor vehicle registration or not" must be "declared and shown on the declarations page " of the umbrella policy "and a small additional premium will be charged for coverage to apply."[4] *Id*.

In addition to the September 7 letter and the NEBC memo, the Kings' umbrella policy itself included a notice of the change in policy. The notice, entitled "New VIP (Umbrella Liability) Policy, Important Notice to Policyholders," states:

> This is a summary of the major changes to your new VIP policy. No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your

---

[4] Again, the parties dispute whether the Kings actually received the notice. But that dispute is immaterial for the same reasons set forth in the preceding footnote, and set forth below in greater detail.

> declarations page for complete information on the coverages you are
> provided. If there is any conflict between the policy and this summary, <u>THE
> PROVISIONS OF THE POLICY SHALL PREVAIL.</u> . . . The major areas
> within the policy that have been changed are highlighted below, with an
> explanation.

Important Notice to Policyholders, doc. # 154-15 (emphasis in original). The notice provides

that "[a]utomatic coverage for recreational motor vehicles <u>not</u> subject to motor vehicle

registration has been deleted. It will now be necessary to declare them, pay an additional charge

and have them shown on your Declarations page for coverage to apply." *Id.* (emphasis in

original).

      D.     The Kings' Excess Liability Coverage

Finally, the Kings own a $5,000,000.00 excess liability policy, issued by National. The

Kings' excess liability policy "follows form" to the Kings' umbrella policy with RICA. As such,

the Kings' claims with regard to the excess liability rise and fall with the claims related to the

umbrella policy. National, unlike NEBC, has not alleged RICA was negligent, but instead joins

RICA's argument that the umbrella policy does not cover the subject accident because no ATV

was listed on the declarations page of the umbrella policy.

**II.**    **Standard of Review**

Summary judgment is appropriate when the evidence demonstrates that "there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported

motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the

light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

Each of the parties has filed a motion for summary judgment, all of which I address herein. In considering the several motions, I must address them separately because the standard of review requires that, for each motion, I construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.

In addition, *Heyman Assocs. No. 1 v. Insurance Co. of the State of Pa.*, 231 Conn. 756, 653 A.2d 122 (1995), sets forth the pertinent standard for interpreting terms of an insurance contract:

> Under [Connecticut] law, the terms of an insurance policy are to be construed according to the general rules of contract construction. The determinative question is the intent of the parties, that is, what coverage the . . . plaintiff expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy. If the terms of the policy are clear and

unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. However, when the words of an insurance contract are, without violence, susceptible of two equally responsible interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. This rule of construction favorable to the insured extends to exclusion clauses.

Our jurisprudence makes clear, however, that although ambiguities are to be construed against the insurer, when the language is plain, no such construction is to be applied. Indeed, courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.

Id. at 770-71 (citations, internal quotations, and brackets omitted). "Interpretation of an insurance policy like the interpretation of other written contracts involves a determination of the intent of the parties as expressed by the language of the policy." *Aetna Life & Casualty Co. v. Bulaong*, 218 Conn. 51, 58 (1991). "Unlike certain other contracts, however, where absent statutory warranty or definitive contract language the intent of the parties and thus the meaning of the contract is a factual question subject to limited appellate review . . . construction of a contract of insurance presents a question of law . . . ." *Id.*

## III.  The Kings' Homeowner's Policy

The Kings argue that their homeowner's policy covers the injuries that McEntee suffered in the May 5, 2002 accident. As previously stated, the Kings' policy defines an "insured location" as either (a) "the residence premises;" (b) "the part of other premises, other structures and grounds used by you as a residence . . . ;" or (c) "[a]ny premises used by you in connection with a premises in 8.a or 8.b above." Kings' Homeowner's Policy, doc. #146-10 at KING0016. The Kings assert that the portion of Midwood Road upon which the accident occurred constitutes grounds they use as a residence, and in the alternative, that they use the accident site "in

connection with" their residence.  RIC contests both arguments.[5]

A.  Is the Accident Site a Part of the Kings' Residence Premises?

The Kings' policy defines "residence premises" as "[t]he one family dwelling, other structures, and grounds; or that part of any other building; where you reside shown as the 'residence premises' on your Declarations Page."  Kings' Homeowner's Policy, doc. #146-10 at KING0016-0017.

The site of the accident in relation to the Kings' residence is crucial to the outcome of the parties' claims regarding the homeowner's policy.  RIC submitted a map of the relevant area, which is attached hereto as an appendix.  Map of One Deer Park Ct., doc. #157-3 ("Mapquest Map").  The Kings live at One Deer Park Court in the "Deer Park Association," a private homeowners' association of which they are members.  King Aff., doc. #146-2.  Deer Park Court runs in an east-west direction and "dead-ends" at the east end.  Mapquest Map.  The west end of Deer Park Court forms a "T" intersection with Midwood Road.  *Id*.  Midwood Road runs in a north-south direction and "dead-ends" at the north end.  *Id*.  The south end of Midwood Road forms a "T" intersection with Deer Park Meadow Road.  *Id*.

The Kings' property lies on the southeastern corner of the "T" intersection of Midwood Road and Deer Park Court.  To enter and exit the association, the Kings exit their driveway and turn left onto Deer Park Court, traveling in an easterly direction.  *See* King Aff., doc. #146-2.  They then turn left onto Midwood Road, traveling in a southerly direction.  *Id*.  They then turn right onto Deer Park Meadow Road, which leads to the exit of the association.  *Id*.

---

[5] RIC also argues that the exception to the exclusion for motorized land conveyances "not subject to motor vehicle registration."  Because the accident did not occur on an "insured location," I need not resolve that issue.

The accident, in this case, took place at 63 Midwood Road,[6] which is located just north of the intersection of Midwood Road and Deer Park Court ("North Midwood Road").[7] *See* Mapquest Map; RIC's 56(a)(1) statement, doc. #106 at ¶ 5. Chuck Ardito, a claims adjuster, reported that "[t]he incident occurred approximately fifty to seventy five feet away from Deer Park Court." Ardito Report, doc. #156-4 at Royal026.

The Kings' argument that North Midwood Road is part of their "residence premises" fails for at least two reasons. First, the Kings have not listed North Midwood Road on the declarations page of their homeowner's policy. Second, the Kings have not presented any evidence from which a reasonable juror could find that they used, as a residence, the portion of North Midwood Road upon which the accident took place. Depending on the circumstances, the Kings could have used that portion of the road "in connection with" their residence premises. That issue is discussed below. But the road itself does not constitute their "one family dwelling, other structures, and grounds; or that part of any other building; where [they] reside."

Finally, the Kings argue that, by virtue of their ownership of One Deer Park Court and as members of the Deer Park homeowners' association, they have a property interest in and the right

---

[6] The police report indicates that the accident took place on Midwood Road, but specifies the location of the accident in relation to certain utility poles. RIC asserts that the accident took place at 63 Midwood Road, and bases that assertion on an allegation in the state court complaint. *See* RIC's 56(a)(1) statement, doc. # 106 at ¶ 5. Although allegations in a complaint generally do not constitute evidence, the Kings do not dispute the location of the accident. In fact, the Kings appear to concede as much. *See* Kings' Motion, doc. # 145 at p. 11-12.

[7] I refer to the area in which the accident occurred as "North Midwood Road" for clarity and brevity, but also to accentuate the difference between the portion of Midwood Road upon which the Kings regularly traveled and the portion of Midwood Road upon which the Kings did not travel when exiting the association. I acknowledge that Midwood Road is not "officially" divided into north and south.

to travel upon roads within the association, and exercise authority and control over the roads.[8] The policy's definition of "insured location," or "residence premises," however, does not necessarily encompass any piece of property in which the Kings have a property interest. The fact that the Kings have a right to travel upon a road, or even joint ownership of or control over a given piece of property, does not necessarily convert the road into the grounds used by the Kings as a residence. Again, the Kings could have used the road in connection with their residence, but they did not "reside" on Midwood Road.[9]

B.  Did the Kings Use the Portion of Midwood Road Upon Which the Accident Occurred "In Connection With" Their Residence?

Whether the Kings used North Midwood Road in connection with their residence premises is only a slightly closer question. The Kings do not contend that they used North Midwood Road in the common sense of the word "use." They did not use North Midwood Road as a means of ingress to or egress from the association; Midwood road dead-ends to the north. The only evidence the Kings submitted to establish their "use" of Midwood Road is Pendleton King's affidavit, which establishes only that the Kings use Midwood Road south of Deer Park

---

[8] The parties dispute whether the Kings actually had the legal right to use North Midwood Road under their association contract because the Kings do not use that portion of the road for ingress or egress. I need not resolve that issue.

[9] In their motion, the Kings refer to, but appear not to pursue, the argument that the locus of McEntee's claims for negligent supervision and negligent entrustment arise from conduct that took place on the residence premises. Specifically, King, Jr.'s parents allegedly negligently entrusted the ATV to King, Jr., and failed to supervise King, Jr., while King, Jr.'s parents were on the residence premises. To the extent the Kings rely on that argument, I hold it is without merit. In fact, the only case the Kings cite to support that argument contradicts the argument. *See Allstate Ins. Co. v. Drumheller*, 285 F. Supp. 2d 605, 612 n.2 (E.D. Pa 2003) ("The location of the accident rather than the location of the negligence that caused the accident is dispositive on the applicability of the exclusion clause.").

Court to enter and exit the association. *See* King Aff., doc. #146-2.

The Kings argue instead that they "use" North Midwood Road in connection with their residence because they had the legal right to use the road. The Kings' argument rests on the proposition that actual use of a piece of property is not a necessary prerequisite to the policy's "use in connection" requirement. In support of their argument, the Kings cite *Uguccioni v. United States Fidelity & Guaranty Co.*, 597 A.2d 149 (Pa. Super. Ct. 1991).[10] In that case, an individual died in an accident while operating Uguccioni's ATV on a private road in "Cobble Creek Estates," a private homeowners' association. The Court held that "Cobble Creek Estates is a private residential development, and the streets therein are privately owned. These streets, it would seem, are private property used by the insureds in connection with their insured residence. As such, the street on which [the individual] had his fatal accident was an insured location." *Id*. at 150. The *Uguccioni* Court, significantly, noted that the subject roads were "used by the insureds." Admittedly, however, the *Uguccioni* Court appeared to hold that the mere fact the road upon which the accident occurred was a private homeowners' association road was sufficient to satisfy the "use in connection" requirement.

To the extent that *Uguccioni* held that actual use is not necessary to show insureds used a piece of property in connection with their residence, that holding is an outlier that has been expressly, if not impliedly, overturned by subsequent decisions. *See State Farm Fire & Cas. Co. v. MacDonald*, 2004 PA Super 161, *P11 (Pa. Super. Ct. 2004) (expressly limiting the reach of *Uggucioni*, noting that "[i]n common parlance, 'use' means 'continued or repeated exercise or

---

[10] All cases cited in this section interpreted the same "use in connection" clause that is at issue in this case.

employment,' or 'habitual or customary practice,'" and holding that an adjacent field was an insured location because there was "evidence that [the insured] repeatedly rode his ATV from his property onto the adjacent field and back."); *Allstate Ins. Co. v. Drumheller*, 185 Fed. Appx. 152, 158 (3d Cir. 2006) (discussing *MacDonald*, holding that "because MacDonald repeatedly rode his ATV from his property onto the adjacent field and back, he used the adjacent field in connection with his residence premises." Thus, "in connection with" means "the repeated use of the ATV emanating from and returning to the insured's residence."); *Nationwide Mut. Ins. Co. v. Gardner*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 277 (Pa. C.P. 2006) (holding that an adjacent public road was not an insured location because "we have no evidence of repeated use of the ATV on the township road where the accident occurred.").

To determine whether insureds use a piece of property in connection with their residence, a court must consider the nature of the insureds' use of the property. The inquiry is fact-intensive. For example, the court in *Safeco Ins. Co. of Am. v. Clifford*, 896 F. Supp. 1032 (D. Or. 1995), considered whether an insured used an adjacent lot "in connection with" his premises. The evidence indicated that the insured used the lot "for recreation, borrowing and lending garden equipment, helping with chores, loading and unloading livestock and equipment, storing furniture, storing firewood, and burning garbage on [a] burn pile." *Id*. at 1034. The *Safeco* Court held that "[t]hese facts are not sufficient to transform the adjacent land, not owned by the insured, into an 'insured location' under the Policy. [Defendants] do not state that the property is used routinely in any matter connected with the insured property, nor do they indicate that they have an easement for the use of the property." *Id*. at 1036.

The legal right to use property may (or may not) be probative, but it is certainly not

dispositive of whether parties actually use a piece of property "in connection with" their residence premises. *See Nationwide Mut. Ins. Co. v. Prevatte*, 108 N.C. App. 152 (N.C. Ct. App. 1992) (holding that an individual need not have a legal interest in a certain premises to be deemed to have used those premises in connection with his residence). In short, all cases that have considered the issue, with the possible exception of *Uguccioni*, have required actual use to satisfy the "use in connection" requirement.

I also hold that actual use is a prerequisite to satisfying a homeowner's policy clause that requires use of piece of property in connection with a residence premises. In this case, the inquiry ends here; I need not engage in a fact-intensive inquiry because the Kings do not contend, nor have they presented any evidence, that they actually used the portion of North Midwood Road upon which the accident took place.[11] As such, the subject accident, although it occurred *close* to an insured location – fifty to seventy-five feet away – did not occur *on* an insured location. The Kings' homeowner's policy therefore does not provide coverage with respect to McEntee's claims.

## IV. The Kings' Umbrella Policy

The Kings argue that their umbrella policy provides coverage with respect to McEntee's state court claims for two reasons. Initially, they assert that the policy in effect at the time of the accident extended coverage. In the alternative, they assert that, even if coverage did not exist under the policy's terms in effect at the time of the accident, coverage existed under the terms of

---

[11] To the extent the Kings argue that their use of Midwood Road south of where the accident occurred for ingress to and egress from their residence satisfies the "use in connection" requirement, I also reject that argument. The fact that the southern portion of Midwood Road shares the same name with the northern portion of Midwood Road does not convert the northern portion of Midwood Road into a piece of property that the Kings actually used.

a prior policy, and RICA failed to effect a valid change to the policy to exclude coverage.

A.  Did the Kings' Umbrella Policy, as it Existed at the Time of the Accident, Provide Coverage With Respect to McEntee's Claims?

To resolve this question, I need not look beyond the umbrella-policy terms – they are clear and unambiguous on this point. The Kings' umbrella policy, in effect at the time of the accident, expressly does not provide any coverage for motor vehicles unless they are "described as being covered in the declarations." Kings' Umbrella Policy, doc. # 154-4 at KING0049.[12] The Kings cannot dispute that they failed to cause the ATV to be listed on the declarations page of their umbrella policy. *See id*. at KING0041. Because the Kings' policy only covered ATVs listed on their declarations page, and because the Kings' ATV is not listed on that page, the 2002-2003 policy excludes coverage for the ATV.

B.  Did RICA Effect a Valid Change to the Kings' Umbrella Policy to Exclude Coverage for Non-Declared ATVs?

The Kings and NEBC argue that RICA failed to effect a valid change to the Kings' umbrella policy, excluding ATV coverage, because it did not comply with Conn. Gen. Stat. § 38a-323. That statute provides:

> No insurer shall refuse to renew any policy which is subject to the requirements of sections 38a-663 to 38a-696, inclusive, unless such insurer or its agent sends, by registered or certified mail or by mail evidenced by a certificate of mailing, or delivers to the named insured, at the address shown in the policy, at least sixty days' advance notice of its intention not to renew. The notice of intent not to renew shall state or be accompanied by a statement specifying the reason for such nonrenewal.

Conn. Gen. Stat. § 38a-323. In short, the statute provides certain notice requirements triggered

---

[12] Again, the parties submitted different documents they claim to constitute the operative policy. But that dispute is immaterial. Both documents contain the clause that precludes coverage for recreational motor vehicles not described as being covered in the declarations.

-17-

by an insurance company's nonrenewal or conditional nonrenewal.  The statute, however, does not apply to renewals.

RICA did not provide the notice described in the statute; the question is whether it was required to do so.  The parties thus dispute whether the subject policy change constituted a nonrenewal or conditional nonrenewal so as to trigger the statute's notice provisions in the first instance, or whether the change constituted a renewal.[13]

The Kings and NEBC rely almost exclusively on an interpretive bulletin that the State of Connecticut Insurance Department issued May 5, 2004 ("Bulletin"), four years after RICA effected the subject change to the policy.  The Bulletin clarifies the Insurance Department's interpretation of section 38a-323.  It provides that:

> 1. If an insurer intends to continue to insure a risk, either commercial or personal, but under terms or conditions less favorable than previously provided, the insurer must notify the insured by either sending a notice of nonrenewal or conditional renewal notice.  The conditional renewal notice must clearly state or be accompanied by a clear statement that identifies terms or conditions that may be less favorable to the insured under the ensuing policy.
>
> 2.  Any significant reduction of coverage requires either a notice of nonrenewal or a conditional renewal notice.  Some examples where conditional renewal notices are appropriate are: An increase in the policy's deductible or retention.  A decrease in the limits of coverage.  A new exclusion or deletion of coverage.
>
> 3.  The conditional renewal notice must comply with the advance number of days required by statute for nonrenewal of the particular type of policy.  The conditional renewal notice must be sent by registered or certified mail or by mail evidenced by a United States Post Office certificate of mailing, or delivered by the insurer to the insured by the required date.

_____

[13] Darold Palme, RICA's Underwriting Support Director, testified that RICA issued the Kings an "automatic renewal," not a "conditional nonrenewal."  Palme Dep., doc. #154-5, at 240.

Bulletin, doc. # 152, attached exhibit. The Bulletin further provides that an insurance company's failure to provide the required notice of nonrenewal or conditional nonrenewal "shall entitle the insured to a renewal of the policy for a term of not less than one year on the same terms (not including premium) as the expiring policy and the privilege of pro-rata cancellation at the lower of the current or previous year rates if exercised by the insured within sixty days from the renewal or anniversary date." *Id*.

There is no question that I must accord great deference to the Connecticut Insurance Department's interpretation of Conn. Gen. Stat. § 38a-323. The Connecticut Supreme Court has held that "[a]lthough the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given a statute by the agency charged with its enforcement." *Connecticut Alcohol & Drug Abuse Comm'n v. Freedom of Info. Comm'n*, 233 Conn. 28, 39 (1995).

But the issue presented for review is not whether to accord deference to the Connecticut Insurance Department's interpretation of section 38a-323. The issue is whether the Bulletin has retroactive effect – the Connecticut Insurance Department issued the Bulletin in 2004, four years after RICA changed the Kings' policy.

In deciding the issue, a few fundamental concepts bear noting. First, in the absence of legislative intent to the contrary, statutes imposing new substantive obligations generally do not apply retroactively. *See Landgraf v. Usi Film Prods.*, 511 U.S. 244 (1994). Similarly, Conn. Gen. Stat. § 55-3 provides that "[n]o provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect." *Id*. The Connecticut Supreme Court has "uniformly

interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only." *Darak v. Darak*, 210 Conn. 462, 467 (1989). The presumption against retroactivity is "rebutted only when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively." *Miano v. Thorne*, 218 Conn. 170, 175 (1991). The Supreme Court of the United States has also held that "a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf*, 511 U.S. at 273.

The Supreme Court of the United States has also repeatedly stressed the importance of the presumption against the retroactive application of statutes. The rule "is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed." *Union Pacific R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913).

> The presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.

*INS v. St. Cyr*, 533 U.S. 289, 316 (2001); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 265 (1994).[14]

---

[14] The *Landgraf* Court also noted that "the largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting

Second, it is also clearly established that administrative agency rules and regulations are not exempt from the presumption against retroactivity. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988) ("Retroactivity is not favored in the law. Thus . . . administrative rules will not be construed to have retroactive effect unless their language requires this result. By the same principle, a statutory grant of legislative rulemaking authority [to an administrative agency] will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by [the legislature] in express terms. . . . Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."). I address the Kings' and NEBC's retroactivity argument mindful of those fundamental principles.

In this case, the Kings and NEBC have failed to present any support for the proposition that the Connecticut Insurance Department intended the rule set forth in the Bulletin to apply retroactively. They do not cite any language from the text of the Bulletin to indicate such an intent, nor do they cite to any examples of enforcement actions that the Connecticut Insurance Department has brought against companies that have violated the terms of the Bulletin. Instead, the Kings' and NEBC's argument for retroactive application of the Bulletin rests solely on the proposition that the Connecticut Insurance Department, through the Bulletin, was interpreting a previously existing statute, and thus the Insurance Department did not create a new rule or regulation but only clarified a law that existed at the time of the subject policy change.

I disagree. The government in *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412 (D.C. Cir.

contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf*, 511 U.S. at 256. In this case, the parties' contractual rights are at issue.

1994), made a similar argument.  It asserted that "interpretive rules are by nature incapable of having retroactive effect" because, "by definition, . . . they merely reiterate what Congress has already said in a pre-existing statute."  *Id*. at 422.  The Court of Appeals flatly rejected that argument:

> Where we part company with the government is in its notion that interpretive rules merely echo things "that are already express in the statute."  A rule may be interpretive even though it "interprets" a vague statutory duty or right into a sharply delineated duty or right.  Yet the interpretation in a sense changes the legal landscape. . . . [A] precise interpretation is not the same as a range of possible interpretations.

*Id*. at 423-24.  Concurring in part and dissenting in part, then Chief Judge Mikva cited *Georgetown Hospital* for the proposition that "[r]etroactive rulemaking lies beyond the Secretary's power."  *Id*. at 428.  He continued to

> agree with the majority that the gravamen of retroactivity is a rule's practical impact, not its "interpretive" or "legislative" label.  A rule is retroactive if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.

*Id*.  (internal quotations omitted).

At least one Connecticut court has also held that *Georgetown Hospital*'s presumption against the retroactive application of agency rules and regulations "applies in equal force to both legislative and interpretative rules."  *Walsh v. Connecticut Unemployment Comp.*, 2002 Conn. Super. LEXIS 664 (Conn. Super. Ct. 2002) (quoting *Health Ins. Ass'n Of Am. v. Shalala* for the proposition that "interpretive rules, no less than legislative rules, are subject to *Georgetown Hospital*'s ban on retroactivity," declining give retroactive effect to a Connecticut Department of Transportation regulation, but classifying the regulation as "legislative," not "interpretive").

Similarly, when it issued the Bulletin, the Connecticut Insurance Department changed the legal landscape with respect to the interpretation of section 38a-323. The Bulletin "creates a new obligation" on insurance companies by expanding the definition of "nonrenewal" and "conditional nonrenewal" to include any "significant reduction of coverage," or to insuring a risk under "terms or conditions less favorable than previously provided." The previous Insurance Department Bulletin, PC-42, did not even mention the term "conditional nonrenewal." Previous Bulletin PC-42, doc. #163-3.

But an additional loose end remains to be tied. Although I hold that the Bulletin does not apply retroactively, I must determine whether the statutory scheme, as it existed at the time of the subject policy change, required RICA to issue the Kings a nonrenewal or a conditional nonrenewal to make the subject policy change. I hold that it did not.[15] Nothing in section 38a-323 indicates that the policy change at issue here constituted a wholesale "nonrenewal" or "conditional nonrenewal." To the contrary, the policy change was made as part of a renewal, and was not substantial, especially in comparison to the breadth of the coverage under the umbrella policy as a whole. RICA was not categorically cancelling the Kings' coverage, or any major aspect thereof. To the contrary, RICA renewed the Kings' policy with essentially the same coverage, requiring only that covered recreational motor vehicles be listed on their declarations page, and that they pay a very small additional premium for listed vehicles. The Kings and NEBC have presented no support for the proposition that, at the time of the subject policy

---

[15] The parties dispute whether the subject policy change would constitute a nonrenewal or conditional nonrenewal under the Bulletin. I need not address the issue of the potential effect of the Bulletin on this case because the Bulletin does not apply retroactively. I hold only that, in the absence of the Bulletin, the subject policy change did not require RICA to issue the Kings a nonrenewal or conditional nonrenewal.

change, section 38a-323 did not require an insurance company to nonrenew a plan, conditionally or otherwise, in order to effect any change to the policy, no matter how minor. To the extent that the 2004 Bulletin requires otherwise, the Bulletin has no retroactive effect.

Finally, even assuming *arguendo* that the Bulletin should be applied retroactively, that RICA therefore failed to properly effect a valid change to the policy under section 38a-323, and that, as a result, the Kings' prior policy was in effect at the time of the subject accident, the Kings' claims still fail. The Kings have failed to submit any evidence to show that they would have been covered under the prior policy. They have not submitted the prior policy under which they claim to be covered. Instead, they rely on the following testimony from Darold Palme:

> Q - You would agree with me, sir, would you not, that if during the policy period of March 1999 to – March 15, 1999 to March 15, 2000, if the Kings owned a recreational vehicle and were utilising it only on their personal property, it would have been covered under the umbrella policy; correct?
>
> A - That would be my understanding.

Palme. Dep. Tr., doc. #154-5 at p. 239. Palme's testimony thus establishes only the proposition that recreational motor vehicles are covered if used only on their own property. As described earlier, that was not the case here – King, Jr. was operating the ATV on an association road that was admittedly close to the Kings' personal property, but was not on the Kings' personal property. Because the Kings failed to produce any evidence concerning an issue on which they would have the burden of proof at trial, they cannot survive summary judgment for this alternative reason.

In sum, because the Bulletin has no retroactive effect, and because the subject policy change did not constitute a "nonrenewal" or "conditional nonrenewal" under Conn. Gen. Stat. §

38a-323, the change that limited coverage to recreational motor vehicles listed on the declarations page of the umbrella policy did not trigger section 38a-323's statutory notice requirements. As such, the change in the policy was valid and the Kings' umbrella policy does not cover the losses resulting from the subject accident. Even if the Kings' former policy were in effect, the Kings' have not presented any evidence to show that they would have been covered for McEntee's claims under the factual circumstances of the accident.

## V.    The Kings' Excess Liability Policy

The Kings' excess liability policy issued by National follows form to the Kings' umbrella policy. Because RICA's umbrella policy does not provide coverage with respect to McEntee's claims, National's policy also does not provide coverage.

## VI.    The Kings' Negligence Claim Against NEBC

To state a claim for negligence under Connecticut law, a plaintiff must plead facts establishing that the defendant owed it a duty, that it breached the duty, and, as a proximate result, that the plaintiff suffered some compensable harm. *Roach v. Ivari Int'l Ctrs., Inc.*, 77 Conn. App. 93, 99 (Conn. App. Ct. 2003); *Berlin Corp. v. Cont'l Cas. Co.*, 2006 Conn. Super. LEXIS 3305 (Conn. Super. Ct. 2006)

In their third-party complaint, the Kings allege that NEBC was negligent because "[t]he $5 million umbrella policy issued by [RICA] should have been written as a follow form policy to mirror the terms of the homeowner's policy," and that NEBC's failure to write the umbrella policy – which contains an exclusion for ATVs not present in the homeowner's policy – to mirror the terms of the homeowner's policy fell below the standard of care of a reasonable and prudent broker in like circumstances." Third-Party Complaint, doc. # 30 at 4, ¶ 26-27. The

complaint continues "[a]s a direct and proximate result, the Kings have suffered damages." *Id*. at 4, ¶ 28.

The Kings' negligence claim thus hinges on its previous argument that the homeowner's policy covers McEntee's claimed damages. As I previously held, however, coverage for McEntee's claims did not exist under the Kings' homeowner's policy. Thus, the Kings' umbrella policy would not have covered McEntee's claimed damages even if it had followed form to the Kings' homeowner's policy. As such, even assuming the truth of the Kings' allegations regarding NEBC's acts, the Kings cannot prove the acts caused them any damages. The Kings' negligence claim thus fails.

## VII.  Conclusion

With respect to the Kings' homeowner's policy, I hold that the accident did not occur on an "insured location," as the policy defines that term. RIC's summary judgment motion **(doc. # 147)** is thus GRANTED, and the Kings' summary judgment motion **(doc. # 144)** is DENIED.

With respect to the Kings' umbrella policy, I hold that the policy does not cover bodily injury resulting from the use of their ATV because the ATV is not listed on the declarations page. I also hold that RICA validly changed its policy to limit coverage to ATVs listed on the declarations page and to pay an additional premium for such vehicles. Accordingly, RICA's summary judgment motion **(doc. # 104)** is GRANTED. In addition, NEBC's summary judgment motion **(doc. # 152)**, to the extent it argues that RICA was negligent in its renewal of the umbrella policy, is DENIED.

With respect to the Kings' excess liability policy, I hold that, because the policy follows form to RICA's umbrella policy, and because RICA's umbrella policy does not provide coverage

with respect to McEntee's claims, the excess liability policy does not provide coverage. As such, National's summary judgment motion **(doc. # 107)** is GRANTED.

Finally, because the Kings' negligence argument relies on their claim that the homeowner's policy provides coverage, and because I hold that coverage does not exist under the homeowner's policy, NEBC's summary judgment motion **(doc. # 152)**, to the extent it argues that NEBC was not negligent in procuring an umbrella policy that followed form to the homeowner's policy, is GRANTED.

A declaratory judgment shall enter that neither RIC, nor RICA, have a duty to defend or indemnify the Kings in connection with any claims arising out of injuries that Conor McEntee sustained in the May 5, 2002 accident.[16]

Several claims, however, remain pending. For example, RIC and RICA have not moved for summary judgment on the Kings' counterclaims under CUTPA, and for breach of contract and breach of the covenant of good faith and fair dealing. RIC and RICA have also not moved for summary judgment on NEBC's indemnification and contribution claims. NEBC has not moved for summary judgment on the Kings' third-party claims seeking declaratory relief, and alleging breach of contract and breach of fiduciary duty. It appears, however, that many, if not all, of those claims are either: (a) moot; (b) hinge upon an interpretation of the Kings' insurance policies explicitly rejected herein; or (c) otherwise inconsistent with my ruling today. The parties shall report to chambers within 20 days of this ruling whether they intend to pursue any of their remaining claims. If any party intends to do so, the Court will schedule a status conference to discuss the scope and deadlines for completion of any necessary discovery.

---

[16] National has not requested similar declaratory relief.

-27-

Several motions related to discovery also remain pending **(docs. ## 92, 94, 124, 126, and 131)**.  Those appear to be rendered moot by this ruling.  As such, they are DENIED AS MOOT without prejudice to refiling, if necessary, following discussion of the proper scope of discovery at the status conference.

It is so ordered.

Dated at Bridgeport, Connecticut, this 28th day of September 2007.

  /s/  _____

Stefan R. Underhill
United States District Judge
